## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Kim J. H.,                                                   Case No. 18-cv-2736 (MJD/TNL)

                    Plaintiff,

v.                                                          **REPORT & RECOMMENDATION**

Andrew Saul,
Commissioner of Social Security,[1]

                    Defendant.

David F. Chermol, Chermol & Fishman LLC, 11450 Bustleton Avenue, Philadelphia, PA 19116; and Edward C. Olson, 331 Second Avenue South, Suite 420, Minneapolis, MN 55401 (for Plaintiff); and

Michael A. Moss, Special Assistant United States Attorney, Social Security Administration, 1301 Young Street, Suite A702, Dallas, TX, 75202 (for Defendant).

## I. INTRODUCTION

Plaintiff Kim J. H. brings the present case, contesting Defendant Commissioner of Social Security's denial of her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.* This matter is before the undersigned United States Magistrate Judge on cross motions for summary judgment, Plaintiff's Motion for Summary Judgment (ECF No. 12) and the Commissioner's Motion for Summary Judgment (ECF No. 15). These motions have been referred to the

---

[1] Andrew Saul was sworn in as Commissioner of Social Security on June 17, 2019. *Andrew Saul*, Soc. Sec. Admin., https://www.ssa.gov/agency/commissioner html (last visited Jan. 6, 2020). The Court has substituted Commissioner Saul for Nancy A. Berryhill. A public officer's "successor is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name." Fed. R. Civ. P. 25(d).

undersigned for a report and recommendation to the district court, the Honorable Michael J. Davis, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

Based upon the record, memoranda, and the proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's motion be **GRANTED IN PART** and **DENIED IN PART**; the Commissioner's motion be **GRANTED IN PART** and **DENIED IN PART**; and this matter be remanded to the Social Security Administration for further proceedings consistent with this opinion.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB in January 2015, asserting that she has been disabled since May 13, 2014[2] due to stage 4 non-Hodgkin lymphoma ("cancer"),[3] among other things.[4] (Tr. 60, 72.) Plaintiff's application for DIB was denied initially and again upon reconsideration. (Tr. 19, 70, 71, 80, 82.) Plaintiff appealed the reconsideration of her DIB determination by requesting a hearing before an ALJ. (Tr. 19, 96.)

The ALJ held a hearing on November 9, 2017. (Tr. 19, 33, 35, 59.) After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied her request for review. (Tr. 1-5, 16-32.) Plaintiff then filed the instant action, challenging the ALJ's decision. (Compl., ECF No. 1.) The parties have

---

[2] Plaintiff initially asserted that she had been disabled since 2007. (Tr. 19, 60, 168.) Plaintiff subsequently amended her alleged onset date to May 31, 2014. (Tr. 37, 168.) The administrative law judge ("ALJ") appears to have transposed the digits of the amended onset date, and used an alleged onset date of May *13*, 2014, throughout the decision. (Tr. 19, 20, 21, 23.) The parties have not argued that the error had any effect on these proceedings.

[3] "Non-Hodgkin lymphoma (NHL) is cancer of the lymph tissue." *Non-Hodgkin lymphoma*, U.S. Nat'l Library of Medicine, https://medlineplus.gov/ency/article/000581.htm (last visited Jan. 6, 2020).

[4] Plaintiff also asserted that she was disabled due to celiac disease, irritable bowel syndrome, and diverticulitis. (Tr. 60, 72.) The ALJ's treatment of these alleged impairments is not challenged here.

filed cross motions for summary judgment. (ECF Nos. 12, 15.) This matter is now fully briefed and ready for a determination on the papers.

## III. ANALYIS

### A. Legal Standard

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidence is not high." *Id.* "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted); *see Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) ("Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision.").

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Boettcher*, 652 F.3d at 863. The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Id.*; *accord Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

3

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 423(a)(1); 20 C.F.R. § 404.315. An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *see* 20 C.F.R. § 404.1505(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. § 404.1520(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a).

Broadly speaking, Plaintiff challenges (1) the appointment of the ALJ; (2) the ALJ's determination of her residual functional capacity; and (3) the ALJ's failure to consider whether she was eligible for a closed period of disability.

4

### B.  Appointment of the ALJ

Plaintiff argues that the ALJ who conducted the hearing and issued the decision in the underlying administrative proceedings was not properly appointed under the Appointments Clause of the Constitution.  The Commissioner contends that Plaintiff forfeited this argument by failing to raise it to the Social Security Administration during the administrative proceedings.  This Court agrees.

The Eighth Circuit Court of Appeals has determined that because a constitutional challenge under the Appointments Clause is non-jurisdictional, a party may forfeit a challenge under that clause by failing to raise it at the administrative level.  *N.L.R.B. v. RELCO Locomotives, Inc.*, 734 F.3d 764, 798 (8th Cir. 2013).  And, in the context of a Social Security disability proceeding, the Eighth Circuit has held that failure to raise a claim to the ALJ results in waiver of the claim on appeal.  *Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir. 2003).  The Supreme Court also reaffirmed recently that a person is entitled to relief only if he or she "makes a timely challenge" to the administrative body for relief.  *Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018) (citation omitted).

While the Eighth Circuit has not yet addressed the validity of ALJs appointed to hear Social Security disability claims, it appears that every court in this District that has considered the issue has determined that, based on some or all of the above precedent, a claimant waives the issue if he or she does not raise it to the ALJ.  *See, e.g.*, *Long M. v. Berryhill*, No. 18-cv-862 (ECW), 2019 WL 2163384, at *8 (D. Minn. May 17, 2019); *Kimberly B. v. Berryhill*, No. 17-cv-5211 (HB), 2019 WL 652418, at *14 (D. Minn. Feb. 15, 2019); *Audrey M. H. v. Berryhill*, No. 17-cv-4975 (ECW), 2019 WL 635584, at *12

(D. Minn. Feb. 14, 2019); *Catherine V. v. Berryhill*, No. 17-cv-3257 (DWF/LIB), 2019 WL 568349, at *2 (D. Minn. Feb. 12, 2019); *see also Rollie v. Saul*, No. 18-cv-129-CJW-KEM, 2019 WL 4673220, at *10 (N.D. Ia. Sept. 25, 2019) ("Every other district court in the Eighth Circuit to address this issue has also found a Social Security claimant's Appointments Clause challenge raised for the first time on judicial review to be forfeited.").

This Court agrees with the reasoning set forth in those cases. Accordingly, because Plaintiff did not challenge the validity of the ALJ's appointment during the administrative proceeding, she has forfeited that argument on appeal.

### C. Plaintiff's Residual Functional Capacity

Plaintiff's assertions of error primarily concern the ALJ's residual-functional-capacity determination at step four. *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("The fourth step in this analysis requires the ALJ to determine a claimant's [residual functional capacity]." (quotation omitted)).

A claimant's "residual functional capacity is the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."). "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Perks*, 687 F.3d at 1092 (quotation omitted). "Medical records, physician observations, and the claimant's subjective statements about h[er] capabilities may be used to support the [residual functional capacity]." *Id.* "Even

6

though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner." *Id.* (quotation omitted); *see* 20 C.F.R. § 404.1546(c). And, "[a]lthough it is the ALJ's responsibility to determine the claimant's [residual functional capacity], 20 C.F.R. §§ 404.1545(a); 404.1546(c), the burden is on the claimant to establish his or her [residual functional capacity]." *Buford v. Colvin*, 824 F.3d 793, 796 (8th Cir. 2016)

### 1. Medical Evidence

In or around June and July 2014, Plaintiff was diagnosed with cancer. (*See* Tr. 313-19, 375-92, 512-29, 719-24.) Plaintiff's oncologist, Basem Goueli, M.D., Ph.D., initially "elected to treat [Plaintiff] via a watchful waiting approach." (Tr. 529; *accord* Tr. 392, 718; *see, e.g.*, Tr. 710-14.)

In January 2015, however, a CT scan "showed significant lymphadenopathy," and Plaintiff's platelet count was 79,000, prompting Dr. Goueli to "begin treating" Plaintiff's cancer with chemotherapy, bendamustine/rituxan. (Tr. 544; *see* Tr. 326-27, 346-47, 432-33, 551-53, 608-09, 626-27, 663, 706.) Plaintiff started chemotherapy in early February 2015. (Tr. Tr. 593, 596, 650-52, 696-700, 740-43.) Plaintiff had chemotherapy sessions twice per month in February and March. (Tr. 593, 596, 650-52, 594, 649, 740-43, 646-48, 737-39.) She had four sessions in April. (Tr. 643-45, 639, 641-42, 731-36, 754-59.)

CT scans towards the end of April showed "striking improvement" in the lymphadenopathy in Plaintiff's chest, abdomen, and pelvis. (Tr. 628-30.) There was no lymphadenopathy in Plaintiff's neck. (Tr. 631.) Dr. Goueli noted "a complete remission." (Tr. 680; *accord* Tr. 683, 684.)

Plaintiff had additional chemotherapy sessions twice per month in May and June,. (Tr. 636-38, 725-30, 751-53, 748-50.)  Repeat CT scans in early September 2015 showed no lymph node enlargement.  (Tr. 790-92.)  Dr. Goueli continued to describe Plaintiff's cancer as being in complete remission.  (Tr. 871.)  Plaintiff had chemotherapy sessions approximately once every three months between September 2015 and May 2017.  (Tr. 783, 875, 884, 894, 899, 904, 909, 917; *see* Tr. 37.)

During her chemotherapy, Plaintiff occasionally reported feeling nauseous.  *(See, e.g.*, Tr. 686, 869, 873, 878.)  Plaintiff was prescribed medication to take as needed for nausea. (Tr. 42; *see, e.g.*, Tr. 699, 878.)  At the hearing, Plaintiff testified that she continues to feel "queasy."  (Tr. 42.)

Plaintiff also reported experiencing fatigue.  In July 2014, around the time of her initial diagnosis, Plaintiff's fatigue was "mild."  (Tr. 390, 716.)  Beginning in late October 2014 and up to her first round of chemotherapy in February 2015, Plaintiff reported having marked fatigue.  (Tr. 397, 403, 534, 540, 696 702, 710.)  In early March 2015, Plaintiff's fatigue was "vastly improved" with her chemotherapy treatment.  (Tr. 691.)  During subsequent appointments in April, Plaintiff's fatigue continued to be ascribed to her cancer and was noted to be improved with chemotherapy.  (Tr. 680, 686.)  In June 2015, Plaintiff's fatigue was described as mild.  (Tr. 674.)  Plaintiff had continuing complaints of fatigue throughout 2015 and 2016.  (Tr. 867, 871, 879, 900.)

Plaintiff also has a history of anxiety, and has been taking Lorazepam[5] since at least 2013.  (*See, e.g.*, Tr. 296, 361, 863.)  At times, Plaintiff's treatment providers noted that she was more anxious and felt depressed, particularly following her cancer diagnosis.  (*See, e.g.*, Tr. 393, 397, 534, 710.)  Plaintiff's oncologist referred her for an assessment, where testing showed mild depression and moderate anxiety.  (Tr. 402, 539, 708, 714.)  Plaintiff was given information on accessing additional services if she wished.  (Tr. 402-03, 540, 709.)  While Plaintiff's mood was noted to be "vastly improved" in March 2015, she overall continued to experience bouts of anxiety and depression.  (*Compare* Tr. 691 *with* Tr. 696, 674, 871, 879, 900, 905, 914.)

In January 2016, Plaintiff presented to the emergency room with low back pain that "radiate[d] to [her] right groin and 'sho[t] down [her] right leg."  (Tr. 809.)  Plaintiff had normal range of motion but exhibited tenderness in her lumbar region.  (Tr. 812.)  A CT scan of Plaintiff's lumbar spine showed mild degenerative disc disease and mild central spinal canal narrowing.  (Tr. 814-16.)  Plaintiff was diagnosed with lower back pain and sciatica, and referred to physical therapy.  (Tr. 814; *see* Tr. 819-24.)  A physical therapy evaluation showed decreased range of motion, muscle strength, and endurance as well as "impaired posture."  (Tr. 822; *see* Tr. 821-22.)  During a follow-up appointment, "[p]araspinous muscle spasming [was] noted" and Plaintiff had a positive straight-leg-raise on the right.  (Tr. 878.)  Plaintiff was otherwise nontender, had full strength in her lower

---

[5] "Lorazepam is in a class of medications called benzodiazepines . . . [and] works by slowing activity in the brain to allow for relaxation."  *Lorazepam*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a682053 (last visited Jan. 6, 2020).

extremities, and had a normal gait.  (Tr. 878.)  Plaintiff was given a Depo-Medrol[6] shot

and prescribed Toradol[7].  (Tr. 878.)  Plaintiff occasionally had continued complaints of

back and joint pain.  (*See, e.g.*, Tr. 879, 895, 905, 913, 918; *see* Tr. 42.)

### 2.  Opinion Evidence

#### a.  Treating Physician Dr. Hilde-Philips

Amy Hilde-Philips, M.D., is Plaintiff's primary care provider and has treated

Plaintiff "since the mid 2000s."  (Tr. 861; *see* Tr. 409 (appointment to establish care in

March 2008).)  In September 2017, Dr. Hilde-Philips wrote a letter regarding Plaintiff's

cancer and her ability to work.  Dr. Hilde-Philips noted that Plaintiff was diagnosed with

cancer "[s]everal years ago."  (Tr. 861.)  "After [Plaintiff] received chemotherapy in 2015

under the guidance of Dr. Basem Goueli, she needed maintenance chemotherapy agent

Rituxan every 3 months for two years."  (Tr. 861.)

Dr. Hilde-Philips opined that "[d]uring the years that [Plaintiff] received

chemotherapy and maintenance Rituxan, . . . [Plaintiff] was ill and had difficulty working.

The chemotherapy was quite exhausting and could cause persistent nausea/vomiting."  (Tr.

861.)  Dr. Hilde-Philips further opined that "[s]ince [Plaintiff] has been in remission

however, those issues have since subsided."  (Tr. 861.)  Dr. Hilde-Philips additionally

stated:

> It is in my best medical opinion that given her current state of
> health that she would be able to be employable.  I would
> anticipate that she would be able to work 4-8 hour days

---

[6] Depo-Medrol is a brand name for a methylprednisolone injection.  *Methylprednisolone injection*, MedlinePlus,
U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a601157.html (last visited Jan. 6, 2020).
[7] Toradol is a brand name for ketorolac, which is used to treat "moderately severe pain."  *Ketorolac*, MedlinePlus,
U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a693001.html (last visited Jan. 6, 2020).

depending on her degree of endurance.  I do not believe that she is capable of doing heavy labor.  She does not have any underlying musculoskeletal issues that would prevent her from sitting for an extended period of time.  Also would anticipate that she would be able to take breaks that would not be frequent or excessive.  At the current time, she is not receiving any chemotherapy agents; therefore, she has no situation in which medications would be making her ill.  I would predict that given her current state of health that she would be stable and able to reliably attend work on a regular basis.  I again cannot predict w[hat] the future would hold for her.  If and when her cancer would return the situation would be completely different.  If she needed to ever have chemotherapy again she would be too ill to work.

(Tr. 861-62.)

### b.  Consulting Psychologist Dr. Huber

Plaintiff was evaluated by James W. Huber, Ph.D.  (Tr. 761-65.)  Dr. Huber opined that Plaintiff "appear[ed] to have some periodic subclinical anxiety-depressive symptoms in response to her difficult life-health situation but [that] these d[id] not seem to warrant a diagnosis of psychological *disorder*."  (Tr. 764.)  Dr. Huber further opined that Plaintiff "appear[ed] able to understand, remember and follow instructions with a few repetitions"; "[h]er ability to sustain attention and concentration [wa]s adequate for manual tasks"; "her ability to carry out work-like tasks with reasonable persistence and pace varie[d] with how she [wa]s physically feeling"; and "[s]he appear[ed] able to respond appropriately to coworkers and supervisors, and to tolerate at least relatively low levels of stress and pressure in the workplace."  (Tr. 764-65.)

### c. State Agency Psychological Consultants

Citing Dr. Huber's consultative examination, the state agency psychological consultants concluded that Plaintiff had no mental medically determinable impairments. (Tr. 69, 79-80.)  As a result, no mental limitations were recommended initially or on reconsideration.  (*See* Tr. 68-69, 79-80.)

### 3. ALJ's Residual-Functional-Capacity Determination

Finding that Plaintiff had the severe impairments of "chronic fatigue and intermittent joint pain and paresthesias related to status post lymphoma" and "lumbar degenerative disease," the ALJ determined that Plaintiff had the residual functional capacity to perform medium work with the additional postural limitations that she could "frequently climb, balance, stoop, kneel, crouch, and crawl."  (Tr. 22.)

### 4. Treatment of Dr. Hilde-Philips's Opinion

In determining Plaintiff's residual functional capacity, the ALJ "place[d] partial weight on Dr. Hilde-Philips' opinion because the portion of the opinion that suggested that [Plaintiff] could probably not work while on the chemotherapy was predicted, in part, on symptoms that [she] did not even have."  (Tr. 25.)  The ALJ "also place[d] limited weight on the portion that implied [Plaintiff] could not work full-time because the evidence in the record does not support significant prolonged fatigue issues after she started BR treatment."  (Tr. 25.)  The ALJ "place[d] great weight on the portion of the opinion that indicated that [Plaintiff] could not do heavy labor because it is consistent with the overall evidence of record."  (Tr. 25.)  Plaintiff contends that the ALJ did not properly consider Dr. Hilde-Philips's opinion.

Plaintiff first argues that the ALJ rejected Dr. Hilde-Philips's opinion "without even acknowledging the deference due to" the opinions of treating physicians. (Pl.'s Mem. in Supp. at 9, ECF No. 13.) Plaintiff's assertion that "the Court has no way of knowing if the ALJ even assessed the evidence in accordance with the correct legal standards" is belied by the decision itself. *See Carlson v. Astrue*, 604 F.3d 589, 595 (8th Cir. 2010) (ALJ's citation to relevant regulation "tends to confirm that the ALJ recognized and applied the correct legal standard"). The ALJ explicitly stated that "opinion evidence [was considered] in accordance with the requirements of 20 CFR 404.1527." (Tr. 23.) Section 1527 sets forth the manner in which medical opinions are weighed, including the general rule that more weight is given to the medical opinions of treating sources. 20 C.F.R. § 404.1527(c)(2). Later, when discussing the weight assigned to the various medical opinions, the ALJ explicitly acknowledged that Dr. Hilde-Philips was Plaintiff's treating physician. The ALJ did not overlook Dr. Hilde's status as Plaintiff's treating physician.

Plaintiff next argues that the ALJ failed to discuss Dr. Hilde-Philips's opinion that Plaintiff was "limited to sedentary . . . work." (Pl.'s Mem. in Supp. at 11.) Plaintiff characterizes Dr. Hilde-Philips's letter as offering an opinion "for two separate and distinct time periods: (1) Plaintiff "was unable to . . . maintain gainful employment while undergoing chemotherapy," and (2) Plaintiff "at best could perform a sedentary job" after finishing chemotherapy. (Pl.'s Mem. in Supp. at 11.) Plaintiff reads Dr. Hilde-Philips's opinion too broadly.

Following chemotherapy, Dr. Hilde-Philips opined that Plaintiff was not "capable of doing heavy labor" and that she did "not have any underlying musculoskeletal issues

that would prevent her from sitting for an extended period of time." (Tr. 861.) Rather than restricting Plaintiff to sedentary work, Dr. Hilde-Philips opined that Plaintiff's impairments did not limit her ability to sit. The only limitation Dr. Hilde-Philips gave was with respect to "heavy labor." There was no error in failing to read in a limitation that was not actually part of Dr. Hilde-Philips's opinion.

Plaintiff then argues that "the ALJ somehow concluded that [Plaintiff] never experienced symptoms of fatigue/exhaustion or nausea while undergoing chemotherapy" and thus determined that Dr. Hilde-Philips's opinion was "medically unsound." (Pl.'s Mem. in Supp. at 12-13.) According to Plaintiff, the ALJ's decision was inconsistent because the ALJ recognized that Plaintiff suffered from fatigue but then placed reduced weight on the limitations identified by Dr. Hilde-Philip's in connection with her fatigue and nausea.

Plaintiff's argument again misses the mark. The ALJ did not conclude that Plaintiff never experienced fatigue while on chemotherapy. As Plaintiff herself notes, the ALJ recognized that Plaintiff continued to experience fatigue of varying degrees. (*See* Pl.'s Mem. in Supp. at 13; Tr. 24.) The ALJ in fact gave little weight to the state agency medical consultants because their opinions did not reflect Plaintiff's fatigue,[8] and specifically limited Plaintiff to medium work with additional postural limitations based on her fatigue. (Tr. 25.) The ALJ permissibly concluded, however, that Plaintiff's fatigue was not as limiting as alleged because evidence in the record showed that, once Plaintiff began

---

[8] The ALJ did not, as Plaintiff contends, reject their opinions "because they were outdated." (Pl.'s Mem. in Supp. at 14.)

chemotherapy, she did not continue to experience the same level of fatigue. (Tr. 25.) Thus, the ALJ correctly observed that while Plaintiff still experienced fatigue, her fatigue had overall improved. When a treating physician's "opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (quotation omitted). Accordingly, the ALJ was permitted to place less weight on Dr. Hilde-Philips's opinion that Plaintiff could not work full-time because it was inconsistent with evidence in the record showing that Plaintiff's fatigue had improved.

Similarly, while this Court may not have characterized nausea and vomiting in the same manner as the ALJ,[9] the ALJ appropriately recognized that Dr. Hilde-Philips's opinion about Plaintiff's ability to work while on chemotherapy was based in part on the presence of a possible side effect and that Plaintiff did not experience that side effect on a persistent basis. There is substantial evidence in the record to support the ALJ's conclusion that Plaintiff did not suffer from persistent nausea/vomiting, and the ALJ was permitted to accord less weight to Dr. Hilde-Philips's opinion that Plaintiff was unable to work while on chemotherapy on that basis. *See id.*

---

[9] At the hearing, the ALJ asked Plaintiff about how often she felt nauseous. (Tr. 41-42.) When Plaintiff testified that she still felt nauseous, the ALJ replied, "Well, nauseous is actually throwing up." (Tr. 41.) Plaintiff then testified that she does not throw up; her stomach is just "queasy." (Tr. 42.) The ALJ then asked if Plaintiff had ever thrown up because of chemotherapy, and Plaintiff testified that she had not because she was given "medication for it." (Tr. 42.)

### 5. Other Functional Limitations

Plaintiff additionally argues that the ALJ failed to account for all of the physical and mental limitations stemming from her impairments. Again, it is Plaintiff's burden to prove her residual functional capacity. *Buford*, 824 F.3d at 796.

### a. Physical Limitations

The ALJ determined that Plaintiff was capable of performing "medium" work. "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

Plaintiff asserts that her intermittent joint pain and paresthesias as well as her lumbar degenerative disc disease impact her ability to use her upper and lower extremities, but the ALJ did not "pair[] . . . [the] signs and symptoms from her impairments with accompanying work[-]related restrictions." (Pl.'s Mem. in Supp. at 24.) Plaintiff argues that although the ALJ determined that these conditions were severe impairments, the ALJ did not include any functional limitations for these impairments in her residual functional capacity. Plaintiff also argues that "[t]here is absolutely no evidence to support the finding that [she] can lift 50 pounds." (Pl.'s Mem. in Supp. at 24.)

In support of her argument, Plaintiff points to findings of decreased abdominal strength, impaired posture, and hip weakness. Significantly, however, Plaintiff herself has not paired the signs and symptoms from her joint pain, paresthesias, and lumbar degenerative disc disease with any work-related restrictions. While Plaintiff complains "the ALJ never included any limits in regard to [her] ability to use her arms or legs (walking/standing/lifting/carrying)," (Pl.'s Mem. in Supp. at 23), Plaintiff has not

16

specifically articulated what additional functional limitations resulted from these impairments and should have been included by the ALJ. *See Stormo v. Barnhart*, 377 F.3d 801, 807 (8th Cir. 2004) ("It is appropriate for the ALJ to take a 'functional approach' when determining whether impairments amount to a disability." (quoting *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987))).

The same is true with respect to Plaintiff's cancer. Plaintiff argues that "the ALJ mis-characterized [her] cancer battle as non-severe, casting this disorder as simply a medical dilemma that could be dismissed in four paragraphs." (Pl.'s Mem. in Supp. at 24 (footnote omitted).) Notably, the ALJ found at step two that Plaintiff's "fatigue and intermittent joint pain and paresthesias" were severe impairments "related to Plaintiff's status post lymphoma." (Tr. 22.) At step three, the ALJ considered whether Plaintiff's cancer met or equaled listing 13.05, the listing for lymphoma. (Tr. 22.) *See generally* 20 C.F.R. pt. 404, subpt. P, app. 1, § 13.05. Again, Plaintiff has not specifically articulated what additional functional limitations should have been included by the ALJ. *See Stormo*, 377 F.3d at 807. Plaintiff is ultimately asking this Court to reweigh the medical evidence and her statements concerning the intensity, persistence, and limiting effects of her fatigue and other symptoms.

Further, while Plaintiff asserts that the ALJ erred in considering her work history when evaluating the intensity, persistence, and limiting effects of her symptoms, the ALJ is required to examine the entire case record and any relevant evidence, including information about a claimant's prior work record. *See* 20 C.F.R. § 404.1529(c)(3); *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3p, 2016 WL 1119029,

at *4-7 (Soc. Sec. Admin. Mar. 16, 2016).  The ALJ determined that Plaintiff's work history negatively impacted her statements concerning the intensity, persistence, and limiting effects of her symptoms because Plaintiff had no earnings for the 1990s and had generally worked on a part-time basis.  "A lack of work history may indicate a lack of motivation to work rather than a lack of ability."  *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001).  While Plaintiff may take issue with the conclusion the ALJ drew from her prior work history, the ALJ permissibly considered that work history when evaluating her statements concerning the intensity, persistence, and limiting effects of her symptoms.

In sum, Plaintiff has not met her burden to identify what additional physical and/or postural limitations she has that the ALJ should have incorporated into her residual functional capacity.  *See Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was not harmless, Byes must provide some indication that the ALJ would have decided differently if the error had not occurred.").

### b.  Mental Limitations

Plaintiff next argues that the ALJ erred in the treatment of Dr. Huber's opinion by not addressing the mental limitations he identified in connection with her anxiety and depression.

A claimant's "[residual-functional-capacity] assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms."  *Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional*

*Capacity in Initial Claims*, SSR 96-8p, 1996 WL 374184, at *1 (Soc. Sec. July 2, 1996) [hereinafter SSR 96-8p]. Plaintiff is correct that, when assessing a claimant's residual functional capacity, the ALJ is required to take into account "limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" *Id.* at *5; *see* 20 C.F.R. § 404.1545(a)(2) (considering all medically determinable impairments including those that are not "severe"). As such, a claimant's residual functional capacity represents "the most that she was capable of doing despite the combined effects of both her severe and non-severe medically determinable impairments." *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008).

But, whether severe or non-severe, "only limitations and restrictions attributable to *medically determinable impairments*" are considered when assessing a claimant's residual functional capacity. SSR 96-8p, 1996 WL 374184, at *2 (emphasis added); *see, e.g.*, *Moore v. Berryhill*, No. CV 17-3933-E, 2018 WL 2106470, at *2 (C.D. Cal. May 7, 2018) ("However, in assessing residual functional capacity, the [Social Security] Administration considers *only* medically determinable impairments." ); *Burch v. Astrue*, No. 06-4059-SAC, 2007 WL 1054280, at *6 (D. Kan. Apr. 4, 2007) ("Limitations attributable to impairments which are not medically determinable *may not be* considered, whereas limitations attributed to impairments which are medically determinable but 'not severe' *must be* considered in assessing [residual functional capacity].").

In framing her argument, Plaintiff characterizes her anxiety and depression as non-severe impairments and asserts that "the ALJ's picture of [her] mental health struggles is not correct." (Pl.'s Mem. in Supp. at 31.) Yet, Plaintiff has not argued that the ALJ should

19

have determined that her anxiety and depression were medically determinable impairments in the first place. *See generally* 20 C.F.R. §§ 404.1520a (evaluation of mental impairments), .1521 (establishing medically determinable impairments). The Court will not develop arguments for her. *See Laveau v. Astrue*, No. 11-cv-505 (SRN/LIB), 2012 WL 983598, at *12 n.6 (D. Minn. Feb. 14, 2012), *adopting report and recommendation*, 2012 WL 983630 (D. Minn. Mar. 22, 2012). Dr. Huber as well as both state agency psychological consultants all concluded that Plaintiff's anxiety and depression were not medically determinable impairments. The ALJ placed great weight on the opinions of the state agency psychological consultants and correctly noted that Dr. Huber's "examination revealed no mental health diagnosis." (Tr. 25.)

Because the mental limitations identified by Dr. Huber were not attributable to a medically determinable impairment, the ALJ did not err in declining to address them when assessing Plaintiff's residual functional capacity. *See Burch*, 2007 WL 1054280, at *6; *see also Toney v. Berryhill*, No. 9:17-cv-00080, 2018 WL 4090630, at *4 (D. S.C. Aug. 28, 2018) ("As such, because the ALJ concluded that Toney did not have a medically determinable impairment of fibromyalgia, it would have been improper to consider it in the [residual-functional-capacity] calculation.").

### D. Closed Period of Disability

Lastly, Plaintiff argues that the ALJ erred by not considering whether she was entitled to a closed period of disability between May 2014 and February 2017 due to her inability to maintain regular attendance on account of treatment related to her impairments.

"[D]isability is not an 'all-or-nothing' proposition; a claimant who is not entitled to continuing benefits may well be eligible to receive benefits for a specific period of time." *Harris v. Sec'y of Dep't of Health & Human Servs.*, 959 F.2d 723, 724 (8th Cir. 1992). "If evidence presented to the [Social Security Administration] shows that a claimant was unable to work for at least twelve months, but recovered the ability to work before the decision on her claim is made, she may be eligible for disability benefits for the time she was unable to work." *Mary G. v. Berryhill*, No. 17-cv-3436 (KMM), 2019 WL 1130173, at *5 (D. Minn. Mar. 12, 2019) (footnote and citation omitted). Thus, to be eligible for a closed period of disability, Plaintiff must still meet the 12-month durational requirement. 42 U.S.C. § 423(d)(1)(A); *Mary G.*, 2019 WL 1130173, at *5 (citing cases).

Assessment of a claimant's residual functional capacity requires consideration of "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)." SSR 96-8p, 1996 WL 374184, at *7. The Eighth Circuit has stated that a claimant's residual functional capacity "must be based on [her] ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *McCoy*, 648 F.3d at 617 (quotation omitted). One of the considerations in assessing a claimant's residual functional capacity is "[t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)." SSR 96-8p, 1996 WL 374184, at *5. "[A]bsenteeism from work resulting from a [claimant's] need for treatment may constitute evidence that such [claimant] is

unable to perform work activity on a regular and continuing basis or on an equivalent schedule." *Gordon v. Saul*, No. 8:18-829-T-SPF, 2019 WL 4254470, at \*3 (M.D. Fla. Sept. 9, 2019).

When excessive absenteeism is caused by a claimant's impairment(s), a claimant "is entitled to have it considered by the vocational expert." *Baker v. Apfel*, 159 F.3d 1140, 1146 (8th Cir. 1998). At the hearing, the vocational expert testified that being absent from work two or more days per month would preclude competitive employment. (Tr. 57-58.) The ALJ determined that "the evidence of record does not support . . . missing work two or more days of work for the reasons already discussed." (Tr. 27.) The discussion the ALJ incorporated by reference, however, largely related to Plaintiff's complaints of fatigue and did not address the frequency of her treatment. Thus, it is not clear from the ALJ's decision whether absences to due to treatment were considered.

Plaintiff has pointed to medical records showing that, in the approximately 33-month period between June 2014 and February 2017, she had medical appointments related to her impairments on more than 50 days. (*See* Pl.'s Mem. in Supp. at 18-20.) These appointments included but were not limited to appointments with Dr. Hilde-Philips and her oncologist as well as for imaging, chemotherapy, laboratory tests, and other procedures related to her cancer treatment.

The Commissioner acknowledges that there are certain periods of time in which Plaintiff would be absent more than once per month, but contends that she cannot meet the 12-month durational requirement, bifurcating periods of time in which Plaintiff had more medical appointments from those in which she had less and characterizing "[m]ost of the

treatment events Plaintiff lists . . . [as] merely routine doctor appointments and other examinations and testing."   (Def.'s Mem. in Supp. at 10-11, ECF No. 16.)   The Commissioner also contends that "Plaintiff has failed to show these events could not be scheduled before or after work or on a day off, or at the very least, at the beginning or end of the workday to minimize the amount of work time missed."  (Def.'s Mem. in Supp. at 10.)

The Commissioner acknowledges that at least some of these appointments would require Plaintiff to be absent from work for the entire day.  While the Commissioner disputes that Plaintiff has met the 12-month durational requirement, the Commissioner himself has identified at least 23 days during this 33-month period that Plaintiff would be absent for treatment.  For example, between June 1, 2014 through June 30, 2015, the Commissioner concedes that Plaintiff would be absent due to treatment for 16 days.  In addition to those 16 uncontested days, Plaintiff has identified another 16 appointments related to her cancer treatment during that period, which she estimates would have resulted in an additional 12 total days missed (taking into account whether the appointment would have required her to miss a full or a half day).  Collectively, based on these 28 days, Plaintiff would have been absent two or more days per month in a 13-month period, which the vocational expert testified would preclude competitive employment.

With citations to her medical records, Plaintiff has presented objective evidence showing that she had medical appointments related to her impairments on more than 50 days in a 33-month period, well in excess of the 12-month durational requirement.  *See Baker*, 159 F.3d at 1146; *cf., e.g.*, *Razo v. Colvin*, 663 F. App'x 710, 717 (10th Cir. 2016)

23

(no attempt to substantiate number of appointments with medical records); *Tucker v. Berryhill*, No. 4:16-CV-00679 JAR, 2017 WL 4358721, at *5 (E.D. Mo. Sept. 29, 2017) ("self-serving representation that [claimant] would exceed the one-day-per-month limit outlined by the vocational expert . . . not supported by her medical records"); *Blackburn v. Berryhill*, No. 16-3140-CV-S-ODS, 2017 WL 1968320, at *3 (W.D. Mo. May 12, 2017) (estimated absences based on migraine log not supported by objective medical evidence). The ALJ's discussion regarding the intensity, persistence and limiting effects of Plaintiff's fatigue—which the ALJ found to be a severe impairment "related to [Plaintiff's] status post lymphoma"—did not account for or address any absenteeism due to Plaintiff's significant course of treatment for lymphoma during the relevant period. *Cf. Gordon*, 2019 WL 4254470, at *3.

To be clear, the Court is not saying "that frequency of medical appointments alone" renders a claimant disabled. *Goodman v. Berryhill*, No. C17-5115 BAT, 2017 WL 4265685, at *3 (W.D. Wash. Sept. 25, 2017); *see, e.g.*, *Cherkaoui v. Comm'r of Soc. Sec.*, 678 F. App'x 902, 904 (11th Cir. 2017) (per curiam); *Gordon*, 2019 WL 4254470, at *3. But, "the ALJ must still consider the effects of a claimant's treatment in conjunction with the other evidence of record." *Holmes v. Saul*, No. 3:18-cv-792-J-JRK, 2019 WL 4316740, at *5 (M.D. Fla. Sept. 12, 2019) (citing SSR 96-8p, 1996 WL 374184, at *5); *see Goodman*, 2017 WL 4265685, at *3 ("This is not to say that frequency of medical treatment is irrelevant; rather, it means that to be disabling, the frequency of medical treatment must be necessitated by the medical condition and be substantiated by the evidence.").

24

Ultimately, it may be that Plaintiff is not entitled to a period of closed disability for some or all of these 33 months, whether due to the 12-month durational requirement, an employer's tolerance for full and half days, or some other reason. Or, based on the record as a whole, it may be that Plaintiff would be absent from work less than two days per month, which the vocational expert testified would be tolerated by an employer. These considerations, and the Commissioner's arguments as to the precise period of time in which Plaintiff may be eligible for disability benefits, are best addressed by the ALJ and the vocational expert in the first instance. *See Miller v. Astrue*, No. 1:12-CV-16, 2012 WL 6644390, at *10 (S.D. Ohio Dec. 20, 2012), *adopting report and recommendation*, 2013 WL 360375 (S.D. Ohio Jan. 30, 2013).

Considering the evidence in the record regarding the extent and frequency of Plaintiff's treatment, the ALJ must explain how this course of treatment is reconcilable with the vocational expert's testimony regarding tolerated absences in a manner that allows the Court to determine whether the ALJ's conclusion that Plaintiff would not be absent two or more days per month is supported by substantial evidence in the record as a whole.

**E. Conclusion**

Therefore, the Court recommends that this matter be remanded pursuant to pursuant to sentence four of 42 U.S.C. § 405(g) for reconsideration of Plaintiff's degree of absenteeism at step four and vacating the "alternative findings" at step five.[10] The Court further recommends that the ALJ's decision otherwise be affirmed.

---

[10] Although concluding that Plaintiff was capable of performing her past relevant work (step four), the ALJ went on to make "alternative findings" regarding other jobs Plaintiff was capable of performing (step five). (Tr. 26.)

## IV. RECOMMENDATION

Based upon the record, memoranda, and the proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgement (ECF No. 12) be **GRANTED IN PART** and **DENIED IN PART**.

2. The Commissioner's Motion for Summary Judgment (ECF No. 15) be **GRANTED IN PART** and **DENIED IN PART**.

3. The Commissioner's decision be **AFFIRMED** as to steps one through four, except as to the consideration of Plaintiff's degree of absenteeism at step four, and **VACATED** as to any "alternative findings" at step five.

4. This matter be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

Dated: January __27__, 2020              _____ *s/ Tony N. Leung* _____
                                         Tony N. Leung
                                         United States Magistrate Judge
                                         District of Minnesota


                                         *Kim J. H. v. Saul*
                                         Case No. 18-cv-2736 (MJD/TNL)


## <u>NOTICE</u>

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).